**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TYRONE MARTIN, | : | Civil No. 3:16-cv-2060 |
| | : | |
| Plaintiff | : | (Judge Mariani) |
| | : | |
| v. | : | |
| | : | |
| SECRETARY OF CORRECTIONS, *et al.*, | : | |
| | : | |
| Defendants | : | |

## MEMORANDUM

Plaintiff Tyrone Martin ("Martin"), an inmate who was housed at all relevant times at the State Correctional Institution, Smithfield, Pennsylvania, initiated this action pursuant to 42 U.S.C. § 1983. (Doc. 1). The remaining Defendants are Timothy Myers, Ryan Kanagy, Brent Dickson, Bradd Fazenbaker, Samuel Bickel, Kevin Barger, Susan Gaff, Matthew Morrison, and John Neumann[1] (collectively, "Defendants").[2] Presently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Doc. 219). For the reasons set forth below, the Court will grant Defendants' motion and enter judgment in their favor.

---

[1]   John Neumann passed away on March 16, 2017. (*See* Doc. 217).

[2]   On March 5, 2018, the Court dismissed the claims against John Wetzel, Kevin Kauffman, and William Dreibelbis. (Docs. 131, 132).

## I.   Statement of Undisputed Facts[3]

On May 5, 2015, at the time of the incident, there were approximately 25-30 inmates present on the wing for block-out.  (Doc. 221, Statement of Material Facts, ¶ 1; Doc. 228, Counterstatement of Material Facts, ¶ 1).  Martin had a scheduled call out to go to the law library.  (*Id.* at ¶ 2).  Martin approached Officer Myers to request his library pass.  (*Id.* at ¶ 3).  Myers advised Martin to obtain a pass from the Sergeant.  (*Id.* at ¶ 4).  Martin then went to the Sergeant, but he directed Martin back to Myers.  (*Id.* at ¶ 5).  When Martin returned to speak with Myers, he was already speaking with two other inmates concerning phone time.  (*Id.* at ¶ 6).  Martin interrupted the conversation and once again asked Myers for his library pass.  (*Id.* at ¶ 7).  Myers then ordered Martin to go into the dayroom.  (*Id.* at ¶ 8).  Martin admits to refusing to obey that order.  (*Id.* at ¶ 9).  Defendants contend that Meyers then radioed for assistance and Officer Kanagy arrived.  (Doc. 221 ¶ 10).  Martin asserts that Defendant Myers verbally told the Sergeant to send other correctional officers.  (Doc. 228 ¶ 10).

Defendants contend that Martin then removed his outer clothing, raised his arms, took an aggressive stance, and struck Kanagy.  (Doc. 221 ¶¶ 11, 12).  Martin denies that he

---

[3]   Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF COURT 56.1.  A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried.  *Id.*  Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts.  (Docs. 221, 228).

took a fighting stance and denies "just striking Kanagy." (Doc. 228 ¶¶ 11, 12). Kanagy admits to delivering several counterstrikes to Martin's head and face in an attempt to defend himself and gain control of Martin. (Doc. 221 ¶ 13; Doc. 228 ¶ 13).

Defendants maintain that there is no video of the initial use of force because there are no cameras in that area. (Doc. 221 ¶ 14). Martin asserts that there is video of the incident. (Doc. 228 ¶ 14).

Officers Fazenbaker, Bickel, Barger, and Morrison, among others, arrived at the scene. (Doc. 221 ¶ 15; Doc. 228 ¶ 15). The parties dispute whether Officer Morrison placed handcuffs on Martin. (*Id.* at ¶ 16). Morrison assisted with the escort of Martin to medical. (*Id.*).

Defendants assert that Officer Barger did not get physically involved because there was adequate staff involved at the time. (Doc. 221 ¶ 17). Martin counters that Barger was physically involved in the incident and told Martin that he had physical control over him. (Doc. 228 ¶ 17).

Defendants assert that Officer Fazenbaker attempted to secure Martin's legs, was kicked, which injured his shoulder, and then attempted to help escort Martin off the block. (Doc. 221 ¶ 18). Martin maintains that he did not kick Officer Fazenbaker because his legs were held down by another officer. (Doc. 228 ¶ 18).

3

Officer Bickel also helped escort Martin off the block.  (Doc. 221 ¶ 19).  Martin contends that Bickel took something from his waist area and stabbed him in the face.  (Doc. 228 ¶ 19).

Once restrained, Martin refused to walk on his own.  (Doc. 221 ¶ 20).  Martin contends that he did not walk because he was unconscious.  (Doc. 228 ¶ 20).

A handheld camera was dispatched and recorded the escort portion of the incident.  (Doc. 221 ¶ 21; Doc. 228 ¶ 21).  Myers, Fazenbaker, Bickel, and Morrison picked Martin up and carried him from the block.  (Doc. 221 ¶ 22).  Martin maintains that because he was unconscious, he does not know who carried him off the block.  (Doc. 228 ¶ 22).  Defendants assert that a review of the handheld video reveals that during the escort, Martin continued to struggle, dropped his weight which caused the staff to stumble and hit Martin's head on the doorframe as staff exited the block.  (Doc. 221 ¶ 23; Doc. 228 ¶ 24).  Martin asserts that the video shows his body going limp, which is inconsistent with struggling.  (Doc. 228 ¶ 23).

Once outside, Martin was placed on the ground and staff waited for a restraint chair to arrive.  (Doc. 221 ¶ 24).  Martin was then taken to medical where he was assessed and treated for injuries sustained during the incident.  (Doc. 221 ¶ 25).  Martin asserts that his knees, arms, back, chest, and legs were never checked for any injuries.  (Doc. 228 ¶ 25).  Defendants contend that Martin was treated for a one-inch laceration below his eye, while Martin states that he had two half-inch gashes, consistent with a stab wound, that required

separate stitches. (Doc. 221 ¶ 26; Doc. 228 ¶ 26). Photos were taken to show that no other injuries existed during the assessment. (*Id.* at ¶ 27).

Kanagy, Myers, Dickson, and Fazenbaker sustained injuries and were taken for further assessment and treatment. (Doc. 221 ¶ 28). Martin contends that Kanagy, Myers, Dickson, and Fazenbaker did not go to an outside hospital for further treatment. (Doc. 228 ¶ 28).

During the incident, lieutenant Gaff responded to a radio transmission concerning a staff assault. (Doc. 221 ¶ 29; Doc. 228 ¶ 29). By the time she arrived, Martin was on the floor and was already handcuffed. (*Id.* at ¶ 30). Martin asserts that Gaff failed to intervene, she ordered him to be moved, and ordered that the evidence be destroyed. (Doc. 228 ¶¶ 29, 30).

Defendant Myers issued Martin a Misconduct, Number B760979. (Doc. 221 ¶ 31; Doc. 228 ¶ 31). Defendant Kanagy issued Martin a Misconduct, Number B760637. (*Id.*). A hearing examiner reviewed the matter and found Martin guilty of assault, using abusive or obscene language, and refusing to obey an order. (*Id.* at ¶ 32).

Martin was also charged with several counts of aggravated assault. (*Id.* at ¶ 33). At a bench trial, because Martin is already serving a life sentence, his charges were dropped to two summary offenses of harassment. (*Id.* at ¶ 34). Martin was found guilty of both charges of harassment. (*Id.*).

5

Martin also complains that his legal mail was mishandled on four occasions. (Doc. 221 ¶ 34).

During Martin's deposition on April 18, 2019, Defendants discovered that John Neumann passed away. (Doc. 221 ¶ 35). This information was confirmed during mediation. (*Id.*).

The Department authorizes the use of force against an inmate when a staff member reasonably believes such force is necessary to, among other things, protect oneself or others and/or to effect compliance with the rules and regulations when other methods of control are ineffective or insufficient. (Doc. 221 ¶ 36; Doc. 228 ¶ 36). When force is used, the least amount of force the staff member reasonably believes is necessary to achieve the authorized purpose is to be used and the use of force must stop once control is achieved. (*Id.* at ¶ 37). Any planned or unplanned use of force incident is reported, documented, and reviewed. (*Id.* at ¶ 38).

## II.   Legal Standard

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." FED. R. CIV. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127

S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007).  If a party has carried its burden under the

summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical
> doubt as to the material facts.  Where the record taken as a whole could not
> lead a rational trier of fact to find for the nonmoving party, there is no genuine
> issue for trial.  The mere existence of some alleged factual dispute between
> the parties will not defeat an otherwise properly supported motion for
> summary judgment; the requirement is that there be no genuine issue of
> material fact.  When opposing parties tell two different stories, one of which is
> blatantly contradicted by the record, so that no reasonable jury could believe
> it, a court should not adopt that version of the facts for purposes of ruling on a
> motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## III.   Discussion

### A.    The Claims against John Neumann

#### 1.    *John Neumann's Passing Severed the Attorney-Client Relationship with Respect to the Individual Capacity Claim*

Defendants move for dismissal of all claims against John Neumann in his individual

capacity because he is deceased.  (Doc. 220, p. 13).  The Third Circuit Court of Appeals

has held that an attorney's representation of a client ends when the client dies.  *See Giles v.

Campbell*, 698 F.3d 153, 158 (3d Cir. 2012) (holding that "the Government's representation

of [a correctional officer] ended when [the officer] died").  *See also Bass v. Attardi*, 868 F.2d

45, 50 n.12 (3d Cir. 1989) (counsel lacked standing to act on behalf of former defendant

because "[c]ounsel's attorney-client relationship with [defendant] ceased at [defendant's]

death"); *United States v. Dwyer*, 855 F.2d 144, 145 (3d Cir. 1988) ("the attorneys here, who

represented [defendant] at his criminal trial, lacked legal authority to act as his agents after

his death and thus had no standing to move to abate his conviction").  Pursuant to this

general principle, Neumann's death severed the attorney-client relationship and the Office

of the Attorney General is no longer Neumann's attorney for any claims against him in his

individual capacity.  Thus, the Court will dismiss all claims against John Neumann in his

individual capacity.

### 2. *First Amendment Claim against John Neumann in his Official Capacity*

Martin claims that Defendant Neumann (now deceased), in his official capacity,

incorrectly handled his legal mail on February 8, 2016, March 7, 2016, August 22, 2016, and

September 29, 2016.  (Doc. 1, pp. 4, 9).  The Supreme Court has made clear that prisoners

do not surrender all constitutional rights during their confinement, and the Supreme Court

has instructed that "federal courts must take cognizance of the valid constitutional claims of

prison inmates." *Turner v. Safley*, 482 U.S. 78, 84 (1987).  The Third Circuit has explained

that prisoners "do not forfeit their First Amendment right to use of the mails," particularly with

respect to privileged "legal mail" exchanged with counsel, and that a "pattern and practice of

opening properly marked incoming [legal] mail outside an inmate's presence infringes

communication protected by the right to free speech." *Bieregu v. Reno*, 59 F.3d 1445, 1452

(3d Cir. 1995), *abrogated in part by Oliver v. Fauver*, 118 F.3d 175 (3d Cir. 1997); *Taylor v.*

*Oney*, 196 F. App'x 126, 128 (3d Cir. 2006) (reaffirming holding in *Bieregu* that "prison

officials impinge upon the First Amendment rights of prisoners when they open prisoners' legal mail outside the presence of the addressee prisoner.").

In order to state a claim of this sort under the First Amendment, a prisoner must allege that the interference with his legal mail was done according to a "pattern and practice." *Jones v. Brown*, 461 F.3d 353, 359 (3d Cir. 2006) ("A state pattern and practice . . . of opening legal mail outside the presence of the addressee inmate . . . impinges upon the inmate's right to freedom of speech."). A prisoner may allege that actions were taken pursuant to a pattern or practice without the existence of a "blanket policy." *See, e.g.*, *Jones*, 461 F.3d at 359 (distinguishing between a "pattern and practice" and an "explicit policy"). Prisoners need not allege or prove any "actual injury" beyond the direct injury to their First Amendment right to use the mails. *Taylor*, 196 F. App'x at 128.

Notably, courts have found that mere isolated incidents of opening legal mail outside of an inmate's presence, without evidence of an improper motive, is insufficient to establish a First Amendment violation. *See, e.g.*, *Nixon v. Sec'y Pa. Dep't of Corr.*, 501 F. App'x 176, 178 (3d Cir. 2012) ("[T]he District Court correctly determined that Nixon's claim alleging a single, isolated interference with his personal mail was insufficient to constitute a First Amendment violation."); *Hale v. Pa Dept. of Corr.*, No. 3:07-cv-0345, 2010 WL 3791833, at *3 (M.D. Pa. Sept. 16, 2010) ("opening [court mail] outside [prisoner's] presence on two occasions . . . does not demonstrate a pattern or practice of improper handling of his legal mail sufficient to find a First Amendment violation . . . Isolated incidents of opening legal

mail outside of an inmate's presence, without any evidence of improper motive, is nothing more than an assertion of negligence, and is insufficient to establish a constitutional violation."); *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (accidental opening of a single piece of legal mail did not give rise to a claim); *Beese v. Liebe*, 51 F. App'x 979, 981 (7th Cir. 2002) (dismissing First Amendment claim based on allegations that four pieces of legal mail had been opened outside of inmate's presence, since the inmate presented no evidence that his legal mail had been intentionally opened, and where the inmate-plaintiff merely speculated that the prison official intended to do so).

Here, Martin contends that Defendant Neumann opened his legal mail outside of his presence on four separate occasions in 2016.  Martin sets forth four, isolated incidents in which his legal mail was inadvertently opened outside of his presence because the mail was not properly marked.  The unintentional opening of legal mail outside of Martin's presence on four occasions over an eight-month period does not demonstrate a pattern or practice of improper handling of his legal mail sufficient to find a First Amendment violation. *See Hale*, 2010 WL 3791833, at *3.  The Court finds that these isolated incidents of opening Martin's legal mail outside of his presence, without any evidence of improper motive, is simply insufficient to establish a constitutional violation.  Defendants' motion will be granted on this ground.

### B.    Excessive Force Claim against Defendants Myers, Kanagy, Dickson, Bickel, Fazenbaker, and Morrison

Martin sets forth an Eighth Amendment excessive force claim against Defendants Myers, Kanagy, Dickson, Fazenbaker, Bickel, Barger, and Morrison, based on the May 5, 2015 incident.  (Doc. 1, pp. 3-5, 8-9)  First, Martin asserts that Defendants Myers, Kanagy, and Dickson used excessive force against him on the housing block.  Second, Martin asserts that Defendants Myers, Fazenbaker, Bickel, and Morrison used excessive force against him when transporting him off the housing block to the medical department.

The Eighth Amendment protects prisoners from cruel and unusual punishment, including "the unnecessary and wanton infliction of pain."  *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)); *see also* U.S. CONST. amend. VIII.  To prevail on an Eighth Amendment claim, an inmate must show: (1) a deprivation that is objectively sufficiently serious; and, (2) "a sufficiently culpable state of mind" of the defendant official.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

An Eighth Amendment challenge asserting excessive force is subject to a malicious and sadistic standard.  *See Zimmerman v. Schaeffer*, 654 F.Supp.2d 226, 247 (M.D. Pa. 2009) (citing *Hudson*, 503 U.S. at 6-7).  The inquiry under this standard is whether prison officials applied force "in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."  *Hudson*, 503 U.S. at 6 (citations and quotations omitted); *see also Fuentes v. Wagner*, 206 F.3d 335, 345 (3d Cir. 2000).  In an excessive force case, a prisoner need not show significant injury; however, de minimis uses

of physical force are insufficient to establish an Eighth Amendment violation. *Hudson*, 503 U.S. at 9-10.

The Supreme Court has noted the following factors to determine whether a correctional officer used excessive force in contravention of the Eighth Amendment: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response. *Whitley*, 475 U.S. at 319; *see also Giles v. Kearney*, 571 F.3d 318, 327 (3d Cir. 2009) (same).

Where events at issue have been captured on videotape, the Court must consider that videotaped evidence in determining whether there is any genuine dispute as to material facts. *See Scott*, 550 U.S. at 380-81. The Court must view the facts in the light depicted by the videotape. *See id.* (relying on a videotape in assessing summary judgment evidence and admonishing that the lower court "should have viewed the facts in the light depicted by the videotape."). Defendants have submitted the handheld camera video footage of Martin's escort to the medical department and the closed-circuit video footage from outside the housing unit. (Docs. 220-3, 220-4, 229). Defendants have not submitted any video

footage of the initial incident because there are no security cameras in the area.[4]  (*See* Doc.

220, pp. 16-17; Doc. 220-2, pp. 181-82).

### 1.    *Incident with Defendants Myers, Kanagy, and Dickson*

The Court turns to its consideration of the *Whitley* factors to resolve the "core judicial

inquiry" of "whether force was applied in a good-faith effort to maintain or restore discipline,

or maliciously and sadistically to cause harm."  *Hudson*, 503 U.S. at 7.

First, with regard to the need for application of force, Defendants submitted the

investigation conducted by the Department's Office of Special Investigations and

Intelligence ("OSII"), which contains voluminous statements and affidavits by those

Defendants and inmates present during the incident with Martin.[5]  (Doc. 220-2).  This

evidence provides that Martin was verbally aggressive with Defendant Myers when

attempting to obtain his library pass.  (Doc. 220-2, p. 83).  Defendant Myers called for

assistance and Defendants Kanagy and Dickson arrived on the housing unit.  (*Id.*).  Martin

was given several orders to lock up in his cell and to go to the dayroom.  (*Id.*).  Martin

admits that he refused to obey the orders.  (Doc. 228 ¶¶ 8, 9).  The situation quickly

escalated when Defendants surrounded Martin, in a show of force, and Martin admittedly

---

[4]    On the handheld video, Martin acknowledges that security cameras were recently installed on the housing block, and they may have been connected.

[5]    As part of the OSII investigation, the investigator interviewed twenty-six staff members and four inmates, reviewed the grievances filed by Martin, the affidavit authored by inmate Williamson, and the video footage of the incident.  (Doc. 220-2).  The investigator ultimately found that the staff reports and interviews coincided with the video evidence and the force used by the officers was justified.  (*Id.* at p. 182).

struck Defendant Kanagy.  (*Id.* at ¶ 12; Doc. 220-2, p. 83; *see also* Doc. 1, p. 8 ("in an

attempt to free [himself] Plaintiff struck [Kanagy].")).  On the handheld video footage, Martin

recounts the events and states that "three officers surrounded me . . . and my natural

instinct was to protect myself [by striking an officer]," and  "I did swing, but you rushed me."

Towards the end of the handheld video, officers escorted Martin to a cell, and he stated to

other inmates, I was "fighting these guards."  Kanagy admits to striking Martin in the head

and face in an attempt to defend himself and gain control of Martin.  (*Id.* at ¶ 13).  Because

Martin was uncooperative, admittedly refused direct orders, and struck Kanagy, Defendants

Myers, Kanagy, and Dickson were justified in taking Martin to the ground in an effort to

restrain him.  Therefore, in considering this first factor, the Court concludes that there was

need for the application of force as a result of Martin's uncooperative behavior, his admitted

refusal to obey orders, and his striking Defendant Kanagy.

In considering the second factor, the Court looks at the relationship between the

need and amount of the force used.  In making this inquiry, the Court is reminded that the

reasonableness of a particular use of force is often dependent upon the applicable factual

context and must be "judged from the perspective of a reasonable officer on the scene,

rather than with the 20/20 vision of hindsight."  *Graham v. Connor*, 490 U.S. 386, 396-97

(1989).  Here, the DOC Use of Force Policy provides that the "[u]se of force can consist of a

show of force (non-aggressive) or the physical contact with an offender in a confrontational

situation to control behavior and enforce order.  Use of force includes use of restraints

(other than for routine transportation and movement), chemical agents, and weapons."
(Doc. 220-1, DC-ADM 201, Use of Force Procedures Manual, p. 12).   During his criminal
trial, Martin admitted that when an inmate refuses an order officers "take you away from
everybody, turn you around, cuff you up, then lead you out.   That's the procedure."  (Doc.
230-1, p. 168, N.T. 167:6-8).   Martin admits that he refused the officers' order to lock up in
his cell and go to the dayroom.  (Doc. 228 ¶¶ 8, 9).   In response, Defendants Myers,
Kanagy, and Dickson began with a show of force by surrounding Martin.   When Kanagy
grabbed Martin's arm to place him in handcuffs, Martin admits that he punched Kanagy to
break free and defend himself.   Defendants then took Martin to the ground and placed
restraints on him.   The evidence reflects that Defendants followed the DOC Use of Force
Policy during this incident.

In an effort to show a dispute of material fact with respect to the amount of force
used, Martin has submitted an affidavit of fellow inmate Bobby Williamson, who witnessed
the incident.  (Doc. 228, pp. 9-10).   Martin contends that Defendant Bickel stabbed him in
the face with an unidentified object and inmate Williamson's affidavit purports to corroborate
this statement.  (Doc. 228 ¶ 19; Doc. 228, pp. 9-10).   Inmate Williamson declares that he
saw an officer "[take] something from his waist area, fixed it in a closed fist and commenced
to thrust it into the direction of Mr. Martin's head."  (*Id.* at p. 9).   However, as part of the OSII
investigation, inmate Williamson was interviewed and the security office investigator
unequivocally found that the investigation did not substantiate the allegations made by

Williamson, and the evidence "fail[ed] to prove inmate Williamson's claim that a short officer took something from his waist area, placed it in his fist and commenced to thrust it in the direction of inmate Martin's head." (Doc. 220-2, pp. 5-6, 172; Doc. 228, p. 23). The discovery period has ended, and Martin has not provided the Court with any further evidence that Bickel had anything in his hands or struck Martin in the face with an object. Accordingly, the Court finds that the second *Whitley* factor weighs in favor of Defendants and that the force applied was proportionate to the need to restrain an aggressive Martin and effectuate his compliance with direct orders.

With respect to the third factor, the Court considers the extent of the injury inflicted. The record reflects that Martin sustained a laceration below his right eye and required stitches. On the handheld video footage, Martin also complains of arm and shoulder pain and asks whether medical is going to examine his arms, legs, back, and chest. However, Martin also states: "It's only my eye," and there's a "cut over my eye." The Court is cognizant of Martin's unsupported assertions that he injured his arm and shoulder. However, Martin has produced no medical records or any other documentation to support this assertion. Indeed, the medical records reflect that there were no injuries to Martin's back, or upper and lower extremities, and there was only a small amount of blood on his left pinky finger. (Doc. 220-2, pp. 141-45; Doc. 1, pp. 24-26, 71). Upon review of Martin's injuries, including the photographs and medical reports appended to the complaint and Defendants' motion, the evidence shows that Martin suffered more than a *de minimis* injury

after the May 5, 2015 incident, specifically with respect to his eye injury. Therefore, this factor weighs in favor of Martin.

The fourth factor the Court must consider is the extent of the threat and safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them. Here, at the time of the incident, there were 25-30 inmates in the area, Martin was verbally confrontational, and refused orders. Based on these facts, there was a reasonable perception of a threat to the safety of staff and inmates. Accordingly, this factor weighs in favor of granting summary judgment for Defendants.

The final factor that the Court considers is the effort made by Defendants to temper the severity of a forceful response. Defendants' attempt to isolate Martin in the dayroom reveals that the prison officials made an effort to temper the severity of their response. Despite their efforts to move Martin into the dayroom, away from the 25-30 other inmates, Martin admits that he refused to obey the order. Therefore, this factor also weighs in favor of granting summary judgment in favor of Defendants.

In analyzing the five *Whitley* factors in relation to the facts surrounding the May 5, 2015 incident, the Court finds that the evidence fails to support Martin's claim of excessive use of force against Defendants Myers, Kanagy, and Dickson. It is undisputed that Martin disobeyed direct orders and acted aggressively. In response to Martin's behavior, Defendants took Martin to the ground to gain control of him. It is also undisputed that a fight ensued, resulting in injuries to Martin and the correctional officers. Staff placed Martin in

18

restraints and escorted him off the housing block to avoid any further disruption to the safety

of staff or the security of the cell block.  This was followed by an immediate medical

evaluation which revealed that Martin sustained a laceration near his eye which required

stitches.  Given these circumstances, the Court finds that a reasonable jury could only

conclude that Defendants applied force in a good-faith effort to maintain or restore discipline

and not maliciously and sadistically for the very purpose of causing Martin harm, who was

noncompliant and aggressive.  Therefore, Defendants Myers, Kanagy, and Dickson are

entitled to judgment in their favor with respect to this excessive force claim.

### 2.   *Incident with Defendants Myers, Fazenbaker, Bickel, and Morrison*

The second use of force incident occurred when Defendants Myers, Fazenbaker,

Bickel, and Morrison were escorting Martin to the medical department and he hit his head

on a doorframe.

With regard to the first *Whitley* factor, the need for application of force, the evidence

reveals that the officers needed to remove Martin from the housing block and transport him

to the medical department.  Defendants Myers, Fazenbaker, Bickel, and Morrison picked up

Martin and carried him from the housing block.  (Doc. 220-2, pp. 46-48, 50-51, 53-58, 83).

The closed video footage shows that the correctional officers quickly ran through the

doorway while carrying Martin and he hit his head on a doorframe.  Martin failed to present

any evidence that the officers intentionally slammed him into the doorframe and the video

footage does not portray any intentional act by Defendants.  In considering this first factor,

the Court concludes that there was need for the application of force as a result of Martin's uncooperative behavior.

Second, with respect to the need for application of force and the relationship between the need and the amount of force used, the evidence reflects that Defendants Myers, Fazenbaker, Bickel, and Morrison were justified in carrying Martin off the housing block. Defendants were confronted with Martin, who acted aggressively, disobeyed orders, and engaged in a fight with correctional officers. The Court finds this factor weighs in favor of Defendants and that the force applied was proportionate to the need to restrain Martin.

Third, the Court considers the extent of the injury inflicted. It is undisputed that Martin hit his head on the doorframe. Viewing the facts in light most favorable to Martin, the Court concludes that Martin suffered more than a *de minimis* injury during his transport to the medical department and this factor weighs in his favor.

Fourth, the Court considers the extent of the threat and safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them. In this case, Defendants were confronted with Martin, who was uncooperative, disobeyed orders, and was not walking. Additionally, there were 25-30 other inmates in the immediate area. Based on these facts, there was a reasonable perception of a threat to the safety of staff and inmates. As such, this factor weighs in favor of Defendants.

Lastly, the Court must consider the effort made by Defendants to temper the severity of a forceful response. Again, Defendants' affidavits provide that a split-second decision

20

was made to restrain Martin due to his hostile and noncompliant behavior.  Thus, Martin's

actions posed an immediate threat requiring an immediate response, and there was no time

to attempt to negotiate or reason with him.  The officers' decision to place Martin on the

ground and wait for a restraint chair shows their attempt to temper a response.  The

handheld video footage and closed-circuit video footage show that the force used in taking

Martin to the ground and placing him in a restraint chair was justified and adequately

tempered in order to retain control over him.  The officers did not use any amount of

excessive force to restrain Martin and place in him the restraint chair.  This final factor also

weighs in favor of Defendants.

An inmate asserting a claim of excessive force against a correctional officer must

show that the force was applied "'maliciously and sadistically for the very purpose of

causing harm' instead of 'in a good faith effort to maintain or restore discipline.'"  *Robinson

v. Danberg*, 673 F. App'x 205, 211 (3d Cir. 2016) (quoting *Hudson*, 503 U.S. at 6).  The

Court finds that Defendants Myers, Fazenbaker, Bickel, and Morrison did not act maliciously

or sadistically to cause harm to Martin.  When the officers realized Martin was continuing to

struggle outside of the housing unit, the video evidence reveals that they placed him on the

ground and waited for a restraint chair.  No rational trier of fact could view the video footage,

along with the other evidence of record, and find that the actions of Defendants Myers,

Fazenbaker, Bickel, and Morrison were excessive.  As such, the evidence does not create a

disputed issue of material fact with respect to Martin's May 5, 2015 excessive force claim

against Defendants Myers, Fazenbaker, Bickel, and Morrison and summary judgment will be entered in their favor.

### 3.    Lack of Personal Involvement of Defendant Barger

It is well-settled that "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs. . . .  Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207-08 (3d Cir. 1998); *see also Rizzo v. Goode*, 423 U.S. 362 (1976); *Atkinson v. Taylor*, 316 F.3d 257 (3d Cir. 2003).  Such allegations, however, must be made with appropriate particularity in that a complaint must allege the particulars of conduct, time, place, and person responsible. *Evancho v. Fisher*, 423 F.3d 347, 354 (3d Cir. 2005); *Rode*, 845 F.2d at 1207-08.  Alleging a mere hypothesis that an individual defendant had personal knowledge or involvement in depriving the plaintiff of his rights is insufficient to establish personal involvement. *Rode*, 845 F.2d at 1208.

With respect to Defendant Barger, Martin has not established that Barger had physical contact with him on May 5, 2015.  Martin asserts that Defendant Barger was involved in the use of force incident because he made comments while Martin was being escorted off the block.  Martin's own statements establish that Barger was not present during the first use of force incident; rather, Barger was present during Martin's escort to the medical department (the second use of force incident).  Martin contends that Defendant Barger made the following comments to him during the escort: "ain't working out to well for

22

you is it," "I got your ass," and "it's not gonna be that easy on you, trust me."  (Doc. 226, p.

2).  Defendant Barger's statements to Martin, which may be viewed as inappropriate and

unprofessional, do not amount to malicious behavior violative of the Eighth Amendment

without any accompanying physical injury.  *See Dunbar v. Barone*, 487 F. App'x 721, 723

(3d Cir. 2012) ("[V]erbal threats or taunts, without more, are not sufficient to constitute a

violation of the Eighth Amendment.").  Martin failed to present any evidence that Defendant

Barger used any physical, excessive force on him.  By failing to definitively identify Barger

as the individual who used physical force on him, Martin has, in turn, failed to establish his

personal involvement and culpable state of mind.  The Court will grant Defendants' motion

based on Defendant Barger's lack of personal involvement in the use of force incident.[6]

### C.    Failure to Intervene Claim against Defendant Gaff

Martin next asserts that Defendant Gaff failed to intervene in the use of force incident

on May 5, 2015.  (Doc. 1, pp. 4-5, 9).  In order to prevail on a failure to intervene claim, the

plaintiff must show: "(1) that the defendant failed or refused to intervene when a

constitutional violation took place in his or her presence or with his or her knowledge; and

(2) there was a 'realistic and reasonable opportunity to intervene.'"  *Knight v. Walton*, No.

2:12-CV-984, 2014 WL 1316115, at *8 (W.D. Pa. Mar. 28, 2014) (quoting *Smith v.

Mensinger*, 293 F.3d 641, 651 (3d Cir. 2002)) (citation omitted).  The Third Circuit Court of

---

[6]    At the conclusion of the OSII investigation, it was determined that Officer Barger made unprofessional comments to Martin and it was recommended that he undergo a coaching session for his violations of the Code of Ethics.  (Doc. 220-2, pp. 2, 183).

Appeals has held that a corrections officer who fails to intervene when other officers are beating an inmate may be liable on a failure-to-protect claim if the officer had "a realistic and reasonable opportunity to intervene" and "simply refused to do so." *Smith*, 293 F.3d at 650-51.

With respect to the failure to intervene claim against Defendant Gaff, the record reflects that she responded to a radio call concerning a staff assault. (Doc. 220-2, pp. 10, 46, 86). First, when Defendant Gaff arrived at the scene in the housing unit, Martin was already on the floor and handcuffed. (*Id.*). Martin acknowledges that he "remained on the floor until [Defendant Gaff] arrive[d]." (Doc. 225, p. 7). Because Defendant Gaff arrived at the housing unit *after* Martin was restrained on the floor, Gaff could not have had a reasonable opportunity to intervene in any incident on the housing unit. Second, Defendant Gaff was present during Martin's escort to medical and observed the escort. When Martin became uncontrollable, the handheld video shows that Defendant Gaff ordered a restraint chair to complete the transport to the medical department. With respect to Martin's head hitting the doorpost, the evidence establishes that this was incidental to his quick removal from the housing block. As such, Gaff could not have realistically intervened in this accidental incident. Martin has not produced any evidence that refutes Defendants' evidence with respect to the failure to intervene claim. Under Rule 56, Martin was required to go beyond his pleadings with affidavits or the like in order to establish the existence of a genuine dispute of material fact. *See Celotex Corp.*, 477 U.S. at 324. Martin has failed to

do so.  Accordingly, Defendant Gaff is entitled to judgment in her favor on the Eighth

Amendment failure to intervene claim.

### D.   Retaliatory Misconduct Claim against Defendant Dickson

The First Amendment offers protection for a wide variety of expressive activities.

*See* U.S. CONST. amend I.  These rights are lessened, but not extinguished in the prison

context, where legitimate penological interests must be considered in assessing the

constitutionality of official conduct.  *See Turner*, 482 U.S. at 89.  Retaliation for expressive

activities can infringe upon an individual's rights under the First Amendment.  *See Allah v.*

*Seiverling*, 229 F.3d 220, 224-25 (3d Cir. 2000).  To prevail on a retaliation claim under 42

U.S.C. § 1983, a plaintiff must demonstrate: (1) that he was engaged in constitutionally

protected activity; (2) that he suffered an "adverse action" by government officials; and (3)

that there is "a causal link between the exercise of his constitutional rights and the adverse

action taken against him."  *Rauser v. Horn*, 241 F.3d 330 (3d Cir. 2001) (quoting *Allah*, 229

F.3d at 225).

Defendants argue that, to the extent that Martin sets forth a First Amendment

retaliation claim against Defendant Dickson, this claim fails.  (Doc. 220, pp. 20-21).  In his

brief in opposition to Defendants' motion for summary judgment, Martin clarifies that he "has

never argued anything concerning a misconduct about or attached to Dickson."  (Doc. 225,

pp. 3, 12; Doc. 226, p. 2).  Therefore, Defendants' motion will be granted with respect to any

potential First Amendment retaliatory misconduct claim against Defendant Dickson.

### E.    First Amendment Access to the Courts Claim

Martin appears to assert that Defendants denied him access to the courts based on

his inability to obtain a law library pass in May 2015.  (Doc. 1, p. 6).  In *Bounds v. Smith*,

430 U.S. 817 (1977), the Supreme Court recognized a prisoner's limited right of access to

the courts.  Prisoners are not necessarily "capable of filing everything" but have a right of

access to "attack their sentences, directly or collaterally, and in order to challenge the

conditions of their confinement." *Lewis v. Casey*, 518 U.S. 343, 355 (1996).  "The right of

access to the courts must be adequate, effective and meaningful and must be freely

exercisable without hindrance or fear of retaliation." *Milhouse v. Carlson*, 652 F.2d 371, 374

(3d Cir. 1981) (internal citations omitted).  Following *Lewis*, courts have consistently

recognized that such claims require some proof of an actual, concrete injury, in the form of

direct prejudice to the plaintiff in the pursuit of some legal claim. *See Oliver*, 118 F.3d 175.

An inmate must demonstrate "(1) that they suffered an actual injury—that they lost a chance

to pursue a non-frivolous or arguable underlying claim; and (2) that they have no other

remedy that may be awarded as recompense for the lost claim other than in the present

denial of access suit." *Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008) (quoting

*Christopher v. Harbury*, 536 U.S. 403, 415 (2002)) (internal quotations omitted).

Martin asserts that he was unable to obtain a law library pass in May 2015.  Martin

has not established that he was prevented from pursuing a nonfrivolous legal claim or

defense, or that he actually missed any deadlines in a pending case.  In fact, during his

criminal trial, Martin testified that he had a pending habeas action with a deadline to file

motions two months after the use of force incident, and that he was able to file the

necessary motion.  (Doc. 230-1, pp. 145-46, 156, N.T. 144:19-145:13; 155:5-8).  In failing to

establish actual injury or some legal loss, Martin failed to demonstrate that Defendants'

conduct imposed a substantial impact on him.  *See Monroe*, 536 F.3d at 205-06 (stating that

the complainant in an access to the courts claim "must describe the underlying arguable

claim well enough to show that it is 'more than mere hope', and it must describe the 'lost

remedy.'") (citation omitted).  Consequently, the Court will grant Defendants' motion with

respect to the denial of access to the courts claim.

## IV.    Conclusion

The Court will grant Defendants' motion (Doc. 219) and enter judgment in their favor.

A separate Order shall issue.

Robert D. Mariani
United States District Judge

Dated: March ____, 2021

27